NOTICE

Decision filed 07/23/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230437-U

NO. 5-23-0437

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Shelby County. |
| | ) | |
| v. | ) | No. 21-CF-52 |
| | ) | |
| CHRISTOPHER L. WILLIAMS, | ) | Honorable |
| | ) | Christopher W. Matoush, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's convictions and sentence are affirmed. We find that the defendant is not entitled to reversal, or to reversal with remand for new trial, because (1) there was sufficient evidence presented at trial to support the defendant's convictions with regard to victim L.H., (2) it was not an abuse of discretion to allow the victim to testify via closed circuit television, (3) it was not an abuse of discretion to allow other-crimes evidence of defendant's sexual assault against A.T., (4) it was not an abuse of discretion to admit evidence of a "penis-shaped rock" and related testimony, and (5) the trial court's sentence was not an abuse of discretion.

¶ 2    The defendant, Christopher L. Williams, appeals his convictions and sentence, following a jury trial in the circuit court of Shelby County, for four counts of predatory criminal sexual assault of a child. For the reasons that follow, we affirm the defendant's convictions and sentence.

1

¶ 3                                    I. BACKGROUND

¶ 4      We recite only those facts necessary for an understanding of our disposition of this appeal.

On January 9, 2023, the defendant was tried on four counts of predatory criminal sexual assault of

a child, all Class X felonies.[1] Counts I and V alleged that the defendant, who was over 17 years of

age at the time of the offense, knowingly committed an act of sexual penetration with L.H., who

was under the age of 13 at the time of the offense, in that the defendant placed his mouth on the

penis of L.H. for the purpose of sexual gratification or arousal of the victim or the defendant.

Counts II and VI alleged that the defendant, who was over 17 years of age at the time of the offense,

knowingly committed an act of sexual penetration with L.H., who was under the age of 13 at the

time of the offense, in that defendant placed his nose on the anus of L.H. for the purpose of sexual

gratification of the victim or the defendant. Counts I and II were alleged to have occurred on

October 17, 2020, and counts V and VI were alleged to have occurred on November 14, 2020.

¶ 5      During pretrial proceedings, the trial court heard and ruled upon several motions. The

motions at issue on appeal include the trial court's granting of the State's motion to allow other-

crimes evidence of the defendant's sexual assault against A.T., and the granting of the State's

motion to allow the victim, L.H., to testify at trial by closed circuit television.

¶ 6      On June 9, 2022, the trial court heard the State's motion to admit other-crimes evidence

pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-

7.3 (West 2022)). At the hearing, the State argued that the probative value of allowing the other-

crimes evidence related to A.T. far outweighed any prejudice to the defendant. The State argued

---

[1]Initially, on March 25, 2021, the State had charged the defendant with 12 counts of predatory criminal sexual assault of a child against L.H., and one count of aggravated criminal sexual abuse involving a different victim. Prior to trial, the State was granted leave to file an amended information modifying the specific manner in which the defendant allegedly assaulted L.H. In addition, the State elected to only proceed to trial on counts I, II, V, and VI of the amended information, and dismissed all remaining counts pertaining to L.H. The count involving a different victim was severed for the purposes of trial.

(1) that the proximity in time between the two offenses was very close and only occurred six months apart; (2) there was a high degree of factual similarity between the offenses in that both victims stated the defendant first "licked" or put his mouth on their penis, then flipped them over and placed his face on their buttocks or rectum, and each incident occurred in the middle of the night while the victims were trying to sleep; (3) that each victim was a young adolescent boy under the age of 15, and the defendant had the same type of relationship with the victims; (4) the defendant was in a position of trust or authority over the victims; and (5) each incident occurred at the defendant's home in the living room. The State submitted an interview of A.T. at the hearing, which was admitted into evidence without objection. Defense counsel argued (1) that there was not a sufficient degree of factual similarities between the offenses to meet the threshold for admission, (2) the age difference of 7 and 14 between the victims at the time of the offense was significant, (3) that the "details" of the acts allegedly performed by the defendant are not "strikingly" similar, and (4) that there was only a general commonality of enticement.

¶ 7    On July 18, 2022, the trial court granted the State's motion to admit other-crimes evidence regarding A.T. The trial court found that the allegations were sufficiently similar to those raised by L.H. and had occurred within a six-month period of each other. Further, it found that the offenses all occurred at defendant's residence and both victims indicated the defendant would allow them to ride his motorcycles and four-wheelers which was the main method to lure the children to spend the night at the defendant's home. Additionally, both victims were male and alleged similar specific details regarding the offenses: both alleged that they were asleep or pretending to be asleep when the defendant approached them in the middle of the night, pulled down their pants, and that the defendant made contact with their penis and anus using his mouth and/or nose. Lastly, it found that the vast significant similarities between the offenses enhanced

the degree of probative value well past any substantial undue prejudice against the defendant and granted the other-crimes evidence for any relevant matter including propensity and *modus operandi*.

¶ 8     On December 5, 2022, the trial court heard the State's motion to permit L.H. to testify via closed circuit television pursuant to section 106B-5 of the Code (725 ILCS 5/106B-5 (West 2022)). The State called Allison Watson. She testified she was employed with Memorial Behavioral Health where she was responsible for "mental health case management for at-risk youth." Watson had a bachelor's degree in sociology with a minor in criminal justice and had received specialized training in counseling regarding trauma that results from sexual assault. Prior to her current employment, she was "a domestic violence counselor for the Center for Prevention of Abuse in Peoria" where her work included sexual assault associated with domestic violence. She testified that she provided weekly counseling services for L.H. during which they focused on discussing coping skills, red flags, identifying triggers, and practical implementation. Watson testified that L.H. expressed feelings of discomfort and experienced difficulty in discussing the sexual abuse he experienced such that she would have to play games and avoid the topic of his trauma for "about 15 minutes" before he would be comfortable enough to discuss the topic. L.H. also expressed feelings of fear and discomfort about the prospect of testifying in court in the defendant's presence. She testified she believed it would be "a huge trigger" if L.H. had to testify in an open courtroom with the defendant present. In addition, she testified that L.H. would likely not make eye contact and would be very nervous, anxious, overwhelmed, and distressed. In Watson's professional opinion, L.H. would be so overwhelmed and distressed that he would be unable to reasonably communicate in the courtroom and would suffer severe adverse effects if made to testify in open court in the defendant's presence. By contrast, she believed testifying via closed circuit television

4

would assist him in testifying effectively. On cross-examination, she testified L.H. would frequently ask if there were cameras present when she attempted to talk with L.H. about the allegations or mention the defendant's name. Further, she testified that L.H.'s discomfort about discussing the allegations was so severe that the only time L.H. opened up to her about it was in the garage at his home after ensuring him that no one was around. On redirect, Watson testified that if L.H. had to testify in an open courtroom, it would cause L.H. to "take a step back" and "act out" and that it would be difficult for him to communicate. Further, it would likely cause L.H. to "shut down" and not say all that he should or provide the necessary detail.

¶ 9    The State argued that Watson gave convincing testimony that L.H. would experience severe emotional distress, suffer severe adverse effects, and have a difficult time communicating his testimony if made to testify in open court with the defendant, a jury, and members of the public present. The State noted that Watson had spent a substantial amount of time with L.H. and determined that it takes L.H. a longer time to establish enough trust to comfortably discuss the topic of his sexual abuse. Defense counsel argued that there was no evidence that any threats were levied against L.H. or that there was any basis for him to fear testifying. Further, even if he were allowed to testify out of the courtroom, there would still be attorneys, the court reporter, and the court present, all of whom were strangers.

¶ 10    On December 19, 2022, the trial court granted the State's motion finding that L.H. would suffer significant adverse effects of emotional distress if he was to testify in a courtroom in front of the defendant and jurors and a very high likelihood that L.H. would not be able to communicate effectively. The trial court noted that this was consistent with the apparent effect on L.H. as demonstrated in his forensic interview where L.H. repeatedly indicated he was too shy to talk and hid behind furniture and easel papers when attempting to reflect on the alleged incident.

5

¶ 11    On January 9, 2023, the jury selection process began. On January 10, 2023, a jury was selected and opening statements were given. On January 11, 2023, the State began its case-in-chief. The State's first witness to testify was L.H., who testified by closed circuit television outside the presence of the defendant and the jurors. He testified that he was currently nine years old and in the third grade. He identified the defendant from a photograph that depicted them together. He testified that he had known the defendant for two or three years and that he had spent the night at the defendant's house more than twice. He testified that his stepsister, K.W., was also present at the defendant's home every time he spent the night. He testified that K.W. would sleep on a mattress in the living room, and he would either sleep on the mattress or the couch. L.H. testified the defendant would sleep in his own bedroom. He testified that he liked going to the defendant's house because he could ride four-wheelers and dirt bikes. He testified that on his first sleepover at the defendant's house, he slept on the mattress in the living room floor. He testified that while he was sleeping, the defendant touched him with "[h]is nose and mouth." The State asked L.H. what part of his body the defendant touched with his mouth, and L.H. responded, "[p]rivate," which meant the part used to "go to the potty with." When asked in what manner defendant did this, L.H. answered that the defendant "had his mouth around it." The State next asked L.H. what part of his body the defendant touched with his nose, and he answered, "[m]y butt" and, more specifically, "[t]he part that I go poop from." He testified that he "[a]cted asleep" during the incidents, because if he woke up, "then [the defendant] could do something worse." L.H. testified that he had pants on that night, but the defendant pulled them down. He testified that the defendant went back to his room when "it was all done." He testified that K.W. was asleep on the mattress when this occurred, and she did not wake up. When asked how many different times this happened, L.H. responded, "I do not know, but I know it was more than twice" and "[m]aybe three" times and that the

6

defendant touched him in the same manner each time. He testified that on one occasion, he heard the defendant come in the living room and he asked the defendant for a drink so that the defendant knew he was awake and would stop doing it.

¶ 12    On cross-examination, L.H. testified that he talked with his family about the incident in February of 2021, and later met with Katie Bohland for a forensic interview. In the two years that had passed since the abuse, L.H. met with several counselors and spoke with other people. Defense counsel asked L.H. if he had ever slept in any of the bedrooms at the defendant's house or only on the mattress in the living room, and L.H. responded that he slept in the "bb gun room" once. When asked if anything happened when he slept in that room, L.H. stated the "[s]ame thing happened." Defense counsel confronted L.H. with his statement in the forensic interview, that every time the defendant abused him, it happened when he was sleeping on the mattress next to K.W. He responded, "Every other place I went he touched me. Like no matter what, he wouldn't stop." When asked if the statement he made in the forensic interview was wrong, L.H. responded, "Yes, sir. I didn't really understand." He testified that on October 17, 2020, he was sleeping on the mattress in the living room on the side closest to the kitchen and K.W. slept beside him. He testified that the defendant did something to his "pee pee" first. He acknowledged that he had "sometimes" described what defendant did to his "pee pee" as "he licked it" but testified that he was too scared at that time to talk about it and to say that defendant had "put his mouth around it." He further testified that he was now ready "[t]o actually talk about all of this." L.H. testified that he was on his back when the defendant put his mouth around his penis. He then testified that the defendant turned him over. Defense counsel then questioned L.H. about the touching as follows:

"Q. And, when he turns you over, does he just put his nose near your rear-end?

A. No.

7

Q. Before you said—and again, when you are talking to the family, I think you said he sniffed your butt?

A. Uh-huh.

Q. Is that right?

A. Yes.

Q. Okay. And is that correct, that is what he did? He just sniffed your butt?

A. Yes. Where I go poop from.

Q. But he wasn't licking your butt?

A. No.

Q. He wasn't touching your butt with his mouth or tongue, was he?

A. No.

Q. He was just smelling it; is that right?

A. Yes.

Q. Okay. And you can't be a hundred percent sure if he even touched your butt with his nose or his face; is that right?

A. Well, I felt his nose breathing onto my butt.

Q. You felt it breathing on your butt?

A. Yes.

Q. Okay. I understand you are saying he was breathing on it, but you couldn't feel any actual physical contact; is that right?

A. No, sir.

Q. That is correct?

A. Yes."

8

When L.H. returned to defendant's house for a sleepover in November of 2021, defendant's great-nieces, Kiah and Serenity,[2] also spent the night, but "slept in the bb room." L.H. and K.W. slept on the mattress in the living room. L.H. testified that the same thing happened during this sleepover; defendant put his mouth around L.H.'s penis and was "licking it while he had his mouth around it" and then rolled L.H. over onto his stomach and "sniffed [his] butt." Defense counsel then asked L.H. if it was true that he "couldn't feel if it was actually touching," to which L.H. responded, "Yes, sir."

¶ 13    On redirect, the State asked L.H. if he remembered whether the defendant's nose actually touched his anus, and L.H. responded that it did. He testified that the defendant was breathing hard, as if "he was *** breathing and sniffing both really." The State then questioned L.H. about the physical contact as follows:

"Q. When he was breathing there, was his nose touching the part of your butt where you go poop from?

A. Yes.

Q. Okay. And was that every time that he did that, did you feel his nose touching the part where you go poop from?

A. Yes."

¶ 14    The next witness to testify was Joseph Hall, L.H.'s father. He identified the defendant on the record in open court. He recalled L.H. going to the defendant's house to spend the night in October and November of 2020. He testified that he and his wife, Mandy, learned on February 21, 2021, "that there was a kid that got hurt at [defendant's] house" and "were told that [they] should probably talk to [L.H.]." In describing what L.H. disclosed, Joseph testified:

---

[2]Based upon a review of the record, the last names of Kiah and Serenity are unknown.

9

"Um, very hard conversation. Um, details of what I got from [L.H.] was licking, licking pee pee, licking, touching. I, I, I don't have a whole—you know, I was a little bit in shock when I was trying to do this. But I do remember licking pee pee. And then I remember, um, something about sniffing or blowing on his butt. And I am thinking an eight-year-old trying to tell me—well, that is what I heard."

On cross-examination, defense counsel asked Joseph if, in addition to telling L.H. that it was okay to tell them if something happened, anyone in the room told L.H. that it was also okay if nothing happened. Joseph did not recall.

¶ 15    Jamie Hall was the next witness to testify. She testified that on February 21, 2021, she was at home with her boyfriend, Josiah, and her children when she received a text from Joseph Hall asking if she would bring L.H. to his house to speak with him. She testified that neither she, nor anyone else, spoke to L.H. during the car ride over to Joseph Hall's. Once there, Joseph asked L.H. if he was ever touched inappropriately at the defendant's house. Jamie testified that she could tell something was wrong by the look on his face. Then L.H. started to say, "[w]ell, while I am sleeping," and Jamie began to feel sick and had to go outside. On cross-examination, Jamie testified that she was aware that L.H. went to the defendant's home in October and November. She testified that on each occasion K.W. went with L.H. She testified that L.H. did not say anything to her about being uncomfortable or bothered after either visit to the defendant's home.

¶ 16    Josiah Rhoades was the next witness to testify. He testified that on February 21, 2021, he went with Jamie and L.H. to Joseph's house. He testified that prior to arriving at Joseph's, he was not aware of a general allegation that a child may have been assaulted at the defendant's house. He testified that there were no conversations during the car ride to Joseph's home. Rhoades testified that after they arrived, Joesph asked L.H. if anything had happened during any of the

times that he was at the defendant's house. L.H. did not immediately respond, and everyone reassured L.H. that he was not in any trouble. A short time later, L.H. responded, "When I was sleeping, he licks my pee pee and sniffs my butt." Rhoades described L.H.'s demeanor during this as "[j]ust embarrassed, I guess." There was no cross-examination conducted of Rhoades.

¶ 17    The next witness to testify was Amanda Dunn. She testified that she was married to Joseph in October of 2020, and that L.H. was her stepson. The defendant was the paternal great-uncle of her daughter, K.W. She identified the defendant on the record in open court. On February 21, 2021, she learned from K.W. that another boy had made allegations against the defendant of sexually touching him. She and Joseph discussed the issue and wanted to talk to L.H. She testified that, on the same day, she was present at the family meeting with L.H. She heard L.H. say that the defendant "does stuff to him in his sleep," and then she left the room and went outside. On cross-examination, Dunn acknowledged that L.H. and K.W. went to the defendant's house in October and November. She testified that after each visit to the defendant's house, L.H. did not seem upset or bothered.

¶ 18    The next witness to testify was K.W. She testified that she was 14 years old, and her mother was Amanda Dunn. She testified that the defendant was her uncle and identified him on the record in open court. She testified she liked going to the defendant's house, because he had four-wheelers, a boat, dirt bikes, and an Xbox. She testified that when she and L.H. spent the night at the defendant's house in October, it was only the two of them and that they slept on a mattress on the living room floor. When she and L.H. spent the night at the defendant's house in November, K.W.'s two younger cousins also spent the night. She believed L.H. slept on the mattress on the floor with her that weekend but was not sure. She testified that her two cousins had their own room at the defendant's house. She testified that she did not notice anything unusual happening during

11

the night when she and L.H. were there. She testified that on February 21, 2021, she got a text message from a boy named Dayton informing her that the defendant "raped" A.T., but she did not know any of the details about the allegation. She testified that the family meeting with L.H. occurred that same day. She heard L.H. say "that it only happens when he is sleeping," and she left the room. She testified that L.H. "seemed nervous and like he didn't understand it really" and "like he didn't know it was wrong." On cross-examination, K.W. confirmed that on October 17 and November 14, she and L.H. slept on the mattress on the living room floor at the defendant's house. And, on each occasion, she did not notice, see, or hear anything happening on the mattress.

¶ 19    Katie Bohland was the next witness to testify. She testified that she was a forensic interviewer at the Child First Center in Decatur, Illinois, and had been for 5½ years. She testified her main duty is to conduct forensic interviews of children who are alleged victims of physical abuse of sexual assault. She testified that she has a Bachelor of Science degree in law enforcement, administration of justice, and sociology. She testified she had completed 40 hours of specialized training to conduct forensic interviews through a program facilitated by Child First. She also completed an advanced forensic interview training, a child sex trafficking forensic interview training, quarterly forensic interviewing peer reviews, and an advanced topics training focused on techniques for interviewing preschoolers and children with differing abilities. She testified that she had completed a total of 642 forensic interviews during her career. Bohland testified that on March 10, 2021, she completed a forensic interview of L.H. and that pursuant to protocol with the Child Advocacy Center, the interview was recorded. She testified that L.H. was very talkative at first, but that his demeanor changed when recounting the abuse. She testified that L.H. "appeared to be fairly reluctant to discuss the alleged abuse," and his difficulty reached the point where L.H. preferred to write his answers rather than speaking. People's exhibit 2, a recording of L.H.'s

12

forensic interview, was offered and admitted into evidence, over the defendant's objection and based on the trial court's previous ruling. The recording was published to the jury, and the drawing and diagrams created by L.H. and Bohland during the interview were offered into evidence and used simultaneously with the video of the interview and Bohland's testimony. Bohland identified People's exhibit 3 as a diagram that she used to write down the members of L.H.'s family at his direction. She identified People's exhibit 5 as "the boy anatomical diagram" on which L.H. wrote the words, "pee pee," "bottom," and on the back, "UN" and "DR," which L.H. wrote in response to Bohland's question about whether what occurred was on top of or underneath his clothing. Bohland identified People's exhibit 6 as part of the easel paperwork on which L.H. wrote "nose on butt, mouth on pee pee. I am shy, I want my dad" with a "face that was crying" during the interview. She testified that each exhibit was in the same or substantially same condition now as it was then and admitted into evidence.

¶ 20    On cross-examination, Bohland testified that she never stated to L.H. during the interview that "[i]t is okay if nothing happened." She also confirmed that she did not follow-up on L.H.'s statement, "Since I heard he was a bad guy, I am not going over there." On redirect examination, she testified that she is trained not to lead the child "one way or the other," and she would "never tell them what they could say or not say in a forensic interview." On recross examination, she testified that her job is to understand what the child is telling her, whether something happened or did not happen. In response to defense counsel stating that in the interview she always referred to "what happened" as opposed to "what didn't happen," she stated, "if that is what is in the interview, then yes." On second redirect, Bohland testified that during the entire interview with L.H., he never said, "this never happened," and there were times in the interview where L.H. would speak up and correct her if she was getting things wrong.

¶ 21    A break was taken in the trial, and the parties appeared in chambers with the court. Defense counsel made a continuing objection to the State's other-crimes evidence, including the testimony of A.T. and the other supporting witnesses, and to the DNA evidence regarding the allegations made by A.T. against the defendant. The trial court noted the continuing objection, specifically considered it as related to the DNA evidence, and ultimately denied it. The trial resumed, and the State next offered other-crimes evidence in the form of testimony from the other victim, A.T., and the boys who were with A.T. at the defendant's house at the time the abuse occurred.

¶ 22    A.T. testified that he first met the defendant in the summer of 2019. He identified the defendant on the record in open court. He testified he would usually go to the defendant's house with his brother and friends. He testified he had spent the night at the defendant's house approximately 20 times. He testified he liked going to the defendant's house, because he had game consoles, a boat with inflatables, four-wheelers, a side-by-side, and dirt bikes. A.T. testified that the defendant would take them out to eat, go-karting, water sliding, and bowling. He also testified that the defendant gave him gifts, such as a phone and bb guns. He testified the defendant was physically affectionate with him and would rub his back, give him hugs, and kiss him on the forehead. A.T. was shown People's exhibit 7, which he identified as a "rock shaped like a penis." He testified he had previously seen it at the defendant's home, and the defendant would use it to make jokes with him, his brother, and friends. He testified the defendant would wake him up with it by pressing it against his face or chasing his friends with it. Defense counsel objected to the relevancy of People's exhibit 7 and made a continuing objection to the exhibit and any related testimony. The trial court overruled the objections, and People's exhibit 7 was later admitted into evidence. A.T. testified that in July of 2020, while he and his brother were playing a bowling game on the Nintendo Wii, defendant told A.T. that he would "pinch [his] dick" if he got a strike. A.T.

14

then got a strike and defendant "chased [A.T.] through the house and pinched [his] dick." Defense counsel objected to the relevancy of this testimony, which the trial court overruled, and counsel asked that a continuing objection be shown. A.T. testified that on February 20, 2021, he spent the night at the defendant's house with his brother, Michael M., and two friends, Brylynn H. and Dayton H. A.T. slept on the couch closest to the front door; Michael M. and Brylynn H. were also sleeping in the same room. While A.T. was trying to fall asleep, the defendant approached and began rubbing his back and then "flipped [him] over and pulled [his] pants down and started sucking [his] dick." A.T. testified he did not react and pretended to be asleep because he felt there was nothing he could do in that situation. A.T. ejaculated, and then defendant turned him back over and "put his face in [A.T.'s] rectum." A.T. "tensed up" which made defendant stop. He testified that the defendant pulled his pants back up and rolled him back over before walking away but did not say anything to him. After the defendant left, A.T. woke Michael M. up and told him what happened and then texted his parents and told them as well. The following morning, A.T. told Brylynn H. and Dayton H. what happened. When the defendant woke up, around 8 or 9 o'clock that morning, he told them to get ready to go ride the four-wheelers and instructed A.T. to take a shower first, which was unusual, but A.T. did not do so. A.T., his brother, and two friends acted like everything was normal while they waited for a chance to leave and, when the defendant went into his bedroom, they "took the side-by-side and drove down to the grain bins" where A.T.'s parents were waiting to take him to the police department. A.T. was then taken to the hospital where DNA samples were collected.

¶ 23   On cross-examination, A.T. testified that he was not present and did not know anything about the alleged incidents involving L.H. that occurred at the defendant's house in October or

15

November of 2020. He also testified that when he went to the hospital, it was for the purpose of collecting forensic evidence, and not for any injury.

¶ 24　The next witness to testify was Michael M. He testified that he was 17 years old and that his brother was A.T. He testified he met the defendant through Dayton H. and identified the defendant on the record in open court. He testified he liked going to the defendant's house because of all the games, dirt bikes, and four-wheelers. He testified that there were "no rules, basically" while at the defendant's house. Michael was shown People's exhibit 7, which he identified as a "rock shaped like a penis." He testified the defendant would put it real close to their face, "like touching our mouth," and wake them up with it. Defense counsel objected to the exhibit and to the related testimony, which the trial court overruled. He testified he was at the defendant's house with A.T., Brylynn H., and Dayton H. on February 20, 2021, and slept on the mattress on the living room floor. He testified he did not see or hear anything take place, but A.T. woke him up and said that something had happened. The following morning, the defendant "woke up and instantly went to [A.T.] and asked him if he would go take a shower," which was unusual. Once they were able to leave, they met his and A.T.'s parents, who took them straight to the police department. On cross-examination, he testified that he was not at the defendant's house the weekends of October 17, 2020, or November 14, 2020.

¶ 25　The next witness to testify was Brylynn H. He testified that he was 18 years old and that his brother is Dayton H. He testified he met the defendant through his brother and identified the defendant on the record in open court. He testified he liked going to the defendant's home because of all the activities. He was also shown People's exhibit 7 and told of similar occasions when the defendant had displayed it to them. He testified that on one occasion the defendant said, "I bet your wiener is not bigger than this." He testified that he was at the defendant's house with A.T.,

Michael, and Dayton on February 20, 2021, and slept in the living room. He testified that he did not hear or see anything unusual that night but woke up to a text message the next morning from A.T. saying that something happened. When they left the defendant's, they all went to the grain bins and met A.T.'s parents. On cross-examination, he testified that he was not at the defendant's house on the weekends of October 17, 2020, or November 14, 2020.

¶ 26    The next witness to testify was Dayton H. He testified he was 17 years old and had stayed at the defendant's home. He testified that he was at defendant's home on February 20, 2021, and slept in his own room without waking up during the night. The next morning, A.T. was acting nervous and trying to stay away from the defendant. When asked if the defendant said anything unusual to A.T. that morning, Dayton responded that he remembered the defendant "out of nowhere just saying, 'You should hop in the shower.' " When they left the defendant's house, they drove to the grain bins and met with A.T.'s parents and then left with them. On cross-examination, Dayton testified that he was at the defendant's house the weekend in October when L.H. and K.W. stayed the night. He testified that L.H. and K.W. were sleeping in the living room and he slept in his room. He testified he did not observe anything happen in the living room that night. He testified he was not at the defendant's home the weekend in November when L.H. and K.W. spent the night.

¶ 27    Kaylee Mayberry was the next witness to testify. She testified that she was the adoptive mother of A.T. She testified that A.T. and Michael stayed at the defendant's house almost every weekend around April or May of 2020. She testified that the boys stayed at the defendant's house on February 20, 2021. She testified that she received a text message from A.T. in the early morning hours on February 21, 2021, saying that something happened. After waiting for someone to come babysit, she and her husband drove to Tower Hill and met up with Michael, A.T., Brylynn, and Dayton by the grain bins and then drove them to the police station to report the incident. She

testified that two days after the incident, she tried to find the defendant's Facebook page and was not able to. There was no cross-examination conducted.

¶ 28    The next witness to testify was Aaron Carr. He testified that he was employed as a special agent with the major crimes unit of the Illinois State Police. He testified that he executed a search warrant at the defendant's home on March 3, 2021. The defendant's home was situated in a densely-wooded area near Lake Pana. At defendant's home, officers located multiple recreational vehicles, including four-wheelers, dirt bikes, and side-by-side ATVs. Inside the defendant's home, officers noted that two of the bedrooms and one of the bathrooms were decorated in child-themed décor; one bedroom had bunk beds and was decorated in Hello Kitty cartoon décor and the bathroom was decorated in a similar theme. In the second bedroom, officers observed a dart board and darts, a toy sled or water toy, an arcade game, stuffed animals, bags filled with board games and Lego boxes, pellet guns, and various sporting goods equipment. Also located in the second bedroom were several items of new, children and adolescent clothing with the store tags still attached. In the master bedroom, officers observed a video game console, games, and accessories. In the master bedroom closet, officers discovered "a rock that was in the shape of a penis." He testified that during the search, officers located and seized two cell phones and a laptop computer. The contents of the electronic devices were extracted. Detectives contacted Facebook with a request to preserve defendant's Facebook account on March 1, 2021, and received the contents of the defendant's Facebook. He testified that officers obtained a buccal swab from the defendant for comparison with the rape kit collected from A.T. at the hospital.

¶ 29    On cross-examination, Carr testified that he did not recall the defendant saying that he deactivated his Facebook account, because he was receiving death threats. He testified that during

18

his investigation he never discovered any evidence that suggested Dayton H. was present on the weekend that L.H. stayed at the defendant's house in October.

¶ 30    On January 12, 2023, the jury trial resumed. The next witness to testify was Jessica Kennedy. She testified that she was the emergency room and certified sexual assault nurse at St. Mary's Hospital on February 21, 2021, the day A.T. was brought to the hospital, and that she collected sexual assault kit evidence from him in the form of penile and anal swabs. The sexual assault kit evidence was then sealed and provided to police. She was shown People's exhibit 17, which she identified as the sexual assault kit completed for A.T. and testified that it was in the same or substantially same condition. On cross-examination, Kennedy testified that the only sexual assault kit that she completed was for A.T. Following Kennedy's testimony, a stipulation between the State and the defendant regarding the chain of custody for the sexual assault kit performed on A.T., which was marked as People's exhibit 18, was read to the jury.

¶ 31    The next witness to testify was Svetlana Gershburg. She testified that she was employed as a forensic scientist in the DNA section of the Forensic Sciences Command with the Illinois State Police and had been since 2017. She testified that she had a master's degree in microbiology, three years of academic research in a lab in Russia and the United States, and completed the 19-month Illinois State Police training program for certification. She testified as an expert in the field of DNA analysis. She testified that, in relation to A.T.'s penile swab, she was able to separate DNA that originated from sperm, and DNA that did not originate from sperm. She testified that the DNA present in the sample that originated from sperm had a single source contributor determined to be from A.T., and that the defendant was excluded. She testified that she compared the non-sperm DNA sample from A.T.'s penile swab to that collected from the defendant and determined that there was "very strong support" for the conclusion that defendant's DNA was present in that it was

19

"one nonillion times more likely" that defendant contributed to the sample than someone else. She testified that one nonillion "is a 1 with 30 zeroes behind it." She testified that she also compared the DNA collected from the first sample of A.T.'s anal swabs to the DNA sample collected from the defendant and determined that the defendant was 45 octillion times more likely to be a contributor to the sample and that his DNA accounted for 84% of the total DNA present in the sample. She also testified that she compared the second sample of A.T.'s anal swabs and determined two contributors, A.T. and a separate contributor with an unknown profile. The defendant was excluded from that sample. On cross-examination, Gershburg testified that the analysis and comparisons she completed in this case were limited to the defendant and A.T.

¶ 32 A recess was taken, and in chambers outside the presence of the jury, the State offered several exhibits into evidence, including People's exhibit 7, the rock shaped like a penis. The defendant objected, and the trial court admitted it into evidence over the objection. After the admission of the exhibits, the State rested its case. The defendant then moved for a directed verdict, which was denied.

¶ 33 The jury trial resumed, and the defendant was the next and only witness to testify for the defense. He testified that he has lived at his current residence for over 26 years. He testified that he is a fence installer and owns some rental properties. He testified that K.W. was his great-niece and that L.H. was her stepbrother. He testified that L.H. and K.W. had come to his house on the weekends in October and November of 2020. He testified that he was contacted by K.W. and her mother through Facebook and they set up the overnight for K.W. and L.H. for October 17, 2020. The defendant admitted Defendant's exhibit 9, which were the Facebook communications. He testified to the details of their visit. He testified that the two children slept on a mattress in the living room, and he stayed in his own bedroom until he got up around 7:30 or 8 a.m. The defendant

20

was shown Defendant's exhibits 6 and 8, which he identified as photographs of the living room with the mattress on the floor from different angles. He testified that the photographs were fair and accurate representations of how the mattress was situated during the sleepovers. He testified he never went back into the living room until he got up in the morning to start some coffee. He testified that after breakfast that morning, they rode four-wheelers that day and played by the lake. He took L.H. and K.W. home that evening and L.H. and K.W. gave him a hug good-bye. He testified that neither child was acting uncomfortably at the time. He testified that they spent another night at his house in November. The defendant testified that L.H. has only spent the night at his home two times, in October and November. He testified that in November he was contacted by K.W. through Facebook wanting to come and spend the night. He testified that L.H. and K.W. stayed the night on November 14, 2020. The defendant's great-nieces, Kiah and Serenity, also spent the night. He testified the weather was rainy that day, so he took them to a movie in Decatur. At bedtime, the defendant put the mattress on the floor in the living room. Kiah and L.H. were playing a video game on the mattress, and L.H. fell asleep. Defendant put a blanket over L.H., and L.H. woke up and asked for a drink of water. He testified he got a bottle of water and then went to bed and slept all night. The next morning, K.W. was asleep in the recliner and L.H., Kiah, and Serenity were asleep on the mattress. They all took the four-wheelers to Rosebud to eat breakfast that morning. The defendant testified that he took L.H. and K.W. home later that day.

¶ 34    On cross-examination, the defendant testified he was 56 years old. He testified that he knew L.H. was seven years old in the fall of 2020. He admitted that on a few occasions while Facebook messaging with K.W., he asked if L.H. was going to come over. He testified he does not think that L.H. has "anything against [him]." The defendant denied that he ever touched L.H. inappropriately,

21

put his mouth around L.H.'s penis, licked L.H.'s penis, or rolled L.H. over and put his face in his butt.

¶ 35    On redirect examination, the defendant testified that he suggested to K.W. that L.H. come over prior to October 17, 2020. He testified that when K.W. would stay the night, L.H. would get left at the house. The defense then rested its case. A jury instruction conference was held, and defense counsel objected to the State's instruction on other-crimes evidence to remain consistent with his position. Following closing arguments, the jury retired to deliberate and returned a verdict finding the defendant guilty on all counts.

¶ 36    On March 10, 2023, the trial court heard the defendant's motion for a new trial, which was denied, and held a sentencing hearing that same day. At the sentencing hearing, the trial court heard testimony from Agent Carr, victim impact statements by Joseph Hall and Jamie Hall, four letters on behalf of the defendant, and the testimony of Jared Cox. The defendant made a statement in allocution. The trial court imposed a sentence of 16 years' incarceration in the Illinois Department of Corrections on counts I and V, and 6 years on counts II and VI. The sentences were mandatory consecutive for a total of 44 years' imprisonment. On March 22, 2023, the trial court heard the defendant's motion to reconsider sentence. The trial court granted the defendant credit for the time period he spent on home confinement and denied the motion as to other grounds. The defendant filed a timely notice of appeal on June 16, 2023. Additional facts are incorporated below where necessary.

¶ 37                                II. ANALYSIS

¶ 38                        A. Sufficiency of the Evidence

¶ 39    On appeal, the defendant first contends that the evidence adduced at his jury trial was not sufficient to sustain his convictions for predatory criminal sexual assault of a child. To sustain

convictions on all four counts, the State must "prove that defendant was 17 years of age or older and committed 'an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused' and that the victim was under 13 years of age." *People v. Sauls*, 2022 IL 127732, ¶ 53 (quoting 720 ILCS 5/11-1.40(a)(1) (West 2018)).

¶ 40 When a defendant makes a claim that there was insufficient evidence to sustain his conviction, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* at 416-17. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id.* at 416. As we undertake our review of the evidence under the above standard, we are mindful of the fact that it is axiomatic in Illinois that the testimony of a single witness, if positive and credible, is sufficient to sustain a criminal conviction, even if the testimony is disputed by the defendant. See, *e.g.*, *People v. Loferski*, 235 Ill. App. 3d 675, 682 (1992).

¶ 41     As an initial matter, we note that there is no dispute that the defendant was over 17 years old, and that the victim was under 13 years old, at the time of the incident in this case. The defendant first contends, *inter alia*, that the evidence boils down to the word of L.H., a child, versus the word of the defendant who categorically denied that he had committed the offense. He argues that there was insufficient evidence to prove his guilt on each count of the charged offenses, because (1) on each night in question, K.W. did not wake up and observe the sexual assaults occur despite sleeping next to L.H. on the mattress; (2) the other two girls present during the November sleepover did not wake up or observe the sexual assaults occur; (3) the positioning of the mattress on the living room floor in Defendant's exhibit 6 shows how "impossible" it would have been for the defendant to commit the alleged sexual assault against L.H. without waking K.W.; (4) there was no physical evidence or any other objective evidence to establish the sexual assaults occurred; (5) there was no immediacy of reporting by L.H. that a sexual assault had occurred; (6) L.H. only reported the sexual assaults after he and his family were informed that a separate child had been sexually assaulted by the defendant; and (7) L.H.'s forensic interview and testimony were incredible, in that he was "reluctant to discuss the charges" and contradicted himself on cross-examination when he stated he was assaulted in the bb gun room at the defendant's home on one occasion.

¶ 42     In response, the State emphasizes it is the responsibility of the jury to resolve conflicts in the testimony, weigh the evidence, and draw inferences from the facts, and that it is not the role of this court to reweigh the evidence. The State argues that the defendant is asking this court to reweigh the evidence and further contends that the fact that K.W. did not see or hear anything unusual taking place does not destroy L.H.'s version of the assaults. Further, the State argues that the defendant overlooked that both L.H. and K.W. testified that during the November sleepover,

Kiah and Serenity did not sleep beside L.H. on the mattress but, instead, slept in the bedroom the defendant kept for them at his house. Thus, the jury could have reasonably concluded that they would not have observed the assaults, or simply that they just slept through the night. In addition, the State argues that L.H. testified that he slept on the side of the mattress closest to the kitchen and, based on the various photographs of the living room admitted into evidence, L.H. would have been toward the exposed side of the mattress allowing for more than adequate room to approach L.H. without causing any commotion.

¶ 43 Moreover, the State emphasizes that the other victim, A.T., was also not alone in the defendant's living room when the same acts were committed on him. Michael and Brylynn testified they slept in the living room with A.T. and, like K.W., did not wake to observe what was taking place. Further, there was significant DNA evidence related to the sexual assault on A.T. that provided overwhelming support for the conclusion that the defendant did, in fact, commit the alleged acts against A.T. Additionally, the State argues that physical evidence is not required and its absence is not fatal to the State's case where positive, credible testimony of a single witness, even if contradicted by the defendant, is sufficient to convict a defendant. *People v. Gray*, 2017 IL 120958, ¶ 36. The State also argues that even though L.H.'s disclosure came shortly after A.T.'s, the record establishes that L.H. and A.T. did not know each other, and the details about A.T.'s allegations were unknown to everyone involved. Thus, under these circumstances, the State argues that the nearly identical acts alleged by both victims supports a recounting of actual events, and not fabrication. Finally, the State argues that L.H.'s reluctance to discuss the abuse does not erode the believability of his claims, rather it counters the defendant's claim of fabrication, because it defies logic that one would fabricate a story that makes them so visibly uncomfortable repeating.

25

And to the extent L.H. contradicted his own testimony, his explanation that he did not understand what was being asked at the time was not unreasonable.

¶ 44    The defendant's second contention on appeal is that there was insufficient evidence to prove that the defendant made contact with the victim's anus as required for convictions on counts II and VI. The defendant argues that there was insufficient and contradictory evidence that the defendant made direct contact with L.H.'s anus. Specifically, the defendant argues that L.H.'s disclosure that the defendant "sniffed his butt" and his testimony that defendant "did not touch his butt with his tongue or his mouth," is not sufficient to establish an actual touching of the anus, because the term "butt" is synonymous with the term "buttocks" which is defined in the Merriam Webster Dictionary as "the back of the hip that forms one of the fleshy parts on which a person sits." Further, defendant argues that while the tongue or mouth can be used for sexual contact, "the nose is not a means to create a similar touch that can be visualized as a sort of sexual contact" and its use as a means to smell does not require physical contact. In addition, he contends that there was no proof for counts II and VI of contact "that indicates causing or attempting to cause arousal." He argues that the "act of smelling another's rectum simply cannot be equated to an act of sexual contact required by law," and that any incidental touching was not for the purpose of arousal. Lastly, the defendant argues that L.H.'s testimony during cross-examination, as quoted above in the facts, became unclear as to whether there was contact between the defendant's nose and the victim's anus. He argues that L.H.'s testimony that the defendant "just sniffed" his butt where he goes poop from, and that L.H. could not feel any actual physical contact, is insufficient to prove the charges.

¶ 45    In response, the State asserts that L.H.'s testimony, when taken as whole, was sufficient to establish contact between the defendant's nose and the victim's anus. The State acknowledges that

26

L.H.'s testimony during cross-examination became unclear to some extent but submits that the lack of clarity is more attributable to the questioning posed than any uncertainty as to what happened. The State asserts that defense counsel's questioning of L.H. on cross-examination lacks any attempt to differentiate between the buttocks and the anus, thus leading to the confusion. For example, defense counsel asked, "you can't be a hundred percent sure if he even touched your butt with his nose or his face; is that right?" and L.H. responded, "Well, I felt his nose breathing onto my butt." And counsel asked, "I understand you are saying he was breathing on it, but you couldn't feel any actual physical contact; is that right?" L.H. answered, "No, sir." While L.H. answered in the negative when asked this question, counsel did not specify what he meant by physical contact or about what specific body part. The State argues that L.H.'s responses to the State's questioning dispenses with any confusion as to whether L.H. was referring to his anus or the fleshy part on which he sits when he used the term "butt," because he explained he means "the part that I go poop from." Further, the State argues that L.H.'s testimony on redirect examination rehabilitated any confusion that flowed from his testimony on cross-examination, because he testified clearly that while the defendant was breathing there, the defendant's nose was touching the part of his butt where he goes poop from. Lastly, the State argues that an intent to arouse can be proven by the nature of the act itself, and when considering the contact with the victim's anus occurred directly after the defendant put his mouth around the victim's penis, it can be reasonably inferred it was done for the purpose of sexual gratification or arousal.

¶ 46     We address and consider together the defendant's arguments that (1) there was insufficient evidence to prove the defendant's guilt as to each count and (2) the evidence failed to establish contact with the victim's anus. As explained above, when reviewing a sufficiency of the evidence claim, this court allows all reasonable inferences from the record in favor of the prosecution,

27

whether the evidence in the case is direct or circumstantial, and will not disregard such reasonable inferences that flow from the evidence. See, *e.g.*, *Saxon*, 374 Ill. App. 3d at 416-17. Moreover, we (1) do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact, and (2) will not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* As such, we will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or on the credibility of witnesses unless the evidence is "so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of [the defendant's] guilt." *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991).

¶ 47    As alleged in all four counts, predatory criminal sexual assault of a child is committed when the accused commits " 'an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused.' "[3] *Sauls*, 2022 IL 127732, ¶ 53 (quoting 720 ILCS 5/11-1.40(a)(1) (West 2018)). While "contact" is not defined in the statute, courts have construed that word to mean "any touching." *People v. Kitch*, 2019 IL App (3d) 170522, ¶ 51. This court recently concluded that the State must prove skin-to-skin contact as an element of predatory criminal sexual assault of a child. *People v. Hubbard*, 2024 IL App (5th) 220628-U, ¶ 115.

¶ 48    The evidence that was presented to the jury is described in detail above, and when viewed in the light most favorable to the prosecution, that evidence was sufficient, beyond a reasonable doubt, to sustain the convictions on appeal. Although there were no witnesses to or physical evidence of the sexual assaults to L.H., we find that L.H.'s testimony was credible and sufficient

---

[3]We omit the elements of the offense that require the State to prove the age of the victim and the defendant where it is not at issue in this appeal.

to sustain the convictions and establish contact between the defendant's nose and the victim's anus, despite any contradictions in his testimony on cross-examination. A victim's account " 'need not be unimpeached, uncontradicted, crystal clear, or perfect in order to sustain a conviction for sexual abuse' " or assault. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 84 (quoting *People v. Soler*, 228 Ill. App. 3d 183, 200 (1992)). During his testimony at trial, he gave detailed accounts of the specific facts and circumstances surrounding the sexual assaults, including (1) where he was located in the defendant's home when they occurred, (2) that he was asleep when the defendant approached him and pretended to be asleep until it was over, (3) the specific manner in which the defendant sexually assaulted him, and (4) the order in which the sexual acts took place. Further, his testimony on redirect examination clearly established that during each assault the defendant's nose was touching "the place where [he] goes poop from." This testimony alone, if believed by the jury, was sufficient to establish that the defendant committed several acts of contact, however slight, upon the victim within the statutory definition of sexual penetration. Further, L.H.'s account of the details of the sexual assaults remained consistent from the time of his initial disclosure through trial, including his forensic interview. Additionally, L.H.'s description of the sexual assaults was nearly identical to that of A.T.'s, and the testimony and evidence at trial clearly established that the two victims did not know each other and the details of A.T.'s allegations were unknown to L.H. at the time of his disclosure. Specifically, we conclude that the evidence in its totality, including the victim's testimony, the forensic interview, the testimony from the victim's family, and the other-crimes evidence was not so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt. Accordingly, we conclude that the State's evidence was sufficient to support defendant's convictions for predatory criminal sexual assault of a child.

¶ 49                    B. Victim's Testimony Via Closed Circuit Television

¶ 50     We next turn to the defendant's contention on appeal that the trial court violated his sixth amendment right to confront the victim by granting the State's motion to allow L.H. to testify via closed circuit television (CCTV) from outside the courtroom. We begin by noting our standard of review on this issue. "An appellate court reviews a trial court's decision to permit closed circuit testimony for an abuse of discretion." *People v. Pope*, 2020 IL App (4th) 180773, ¶ 38 (citing *People v. Schmitt*, 204 Ill. App. 3d 820, 825 (1990)). "An abuse of discretion occurs where the circuit court's decision is arbitrary, unreasonable, or fanciful or where no reasonable person would have taken the position adopted by the circuit court." *People v. Heineman*, 2023 IL 127854, ¶ 59.

¶ 51     A defendant's right to confront his accuser may be denied where necessary in furtherance of an important public policy so long as the remaining elements of confrontation are preserved; specifically, "oath, cross-examination, and observation of demeanor by the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 846 (1990). The U.S. Supreme Court has already concluded that protecting children alleged to be victims of child abuse from the trauma of testifying in front of their abuser is one such important public policy. *Id.* at 853 (recognizing that a state's interest in protecting child victims of sex crimes from further trauma and embarrassment is compelling). Thus, "[s]o long as a trial court makes such a case-specific finding of necessity, the Confrontation Clause does not prohibit a State from using a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case." *Id.* at 860.

¶ 52     In Illinois, the policy for furthering this interest is set forth in section 106B-5(a) of the Code as follows:

> "In a proceeding in the prosecution of an offense of criminal sexual assault, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual

abuse, [or] aggravated criminal sexual abuse, *** a court may order that the testimony of a victim who is a child under the age of 18 years *** be taken outside the courtroom and shown in the courtroom by means of a closed circuit television if:

> (1) the testimony is taken during the proceeding; and

> (2) the judge determines that testimony by the child victim *** in the courtroom will result in the child *** suffering serious emotional distress such that the child *** cannot reasonably communicate or that the child *** will suffer severe emotional distress that is likely to cause the child *** to suffer severe adverse effects." 725 ILCS 5/106B-5(a) (West 2022).

¶ 53 The defendant argues, *inter alia*, that the trial court erred when it granted the State's motion, because (1) Allison Watson, the State's witness, was not qualified to provide an opinion as to L.H.'s ability to testify in open court, (2) she had limited exposure to L.H., (3) her testimony failed to establish that L.H. would suffer emotional distress or the likelihood that testifying in open court would cause him to suffer severe adverse effects, and (4) she did not testify that the effects L.H. would experience would be caused by the defendant rather than the spectacle of the courtroom.

¶ 54 In response, the State argues that there is no statutory provision requiring any specific qualifications or expertise for a witness testifying under the statute. In addition, there is no requirement that a witness conduct any specific type of investigation or rely on specific types of evidence. The State argues that absent any authority requiring specialized education and expertise in psychology, Watson's educational background, which included a bachelor's degree in sociology with a minor in criminal justice, over 60 hours of specialized training in trauma resulting from sexual assault, and previous experience as a counselor in domestic violence involving sexual

31

assault, and her testimony provided a sufficient basis for the trial court to grant the State's motion. In addition, the State argues that Watson had sufficient exposure to L.H. to give an opinion, because she had been counseling L.H. for one hour each week for almost four months. Further, Watson specifically testified that L.H. had a "[v]ery difficult" time discussing the abuse, "he would be very uncomfortable and scared" if he had to testify in court in the presence of the defendant and testifying "would be a huge trigger to him" causing him to be "anxious," "overwhelmed," and "distressed." In addition, Watson testified that in her opinion L.H. would not be able to reasonably communicate in the courtroom and would suffer severe adverse effects if made to testify in the courtroom in the presence of the defendant. Lastly, the State argues that it is ultimately the presiding judge who must determine whether the emotional distress and adverse effects would be severe, and that the majority of the defendant's argument is conclusory and provides no supporting legal authority.

¶ 55    In this case, the trial court did not abuse its discretion when it determined that L.H. would suffer significant adverse effects of emotional distress if he was to testify in a courtroom in front of the defendant and jurors and a very high likelihood that L.H. would not be able to communicate effectively. The trial court noted that this was consistent with the apparent effect on L.H. as demonstrated in his forensic interview where L.H. repeatedly indicated he was too shy to talk and hid behind furniture and easel papers when attempting to reflect on the alleged incident. The defendant's conclusory assertions that Watson was not qualified to provide an opinion regarding L.H.'s ability to testify without providing any supporting legal authority for his position are rejected. Watson's qualifications and testimony, as described in detail above, were sufficient to support the trial court's determination. Accordingly, there was no abuse of discretion in allowing L.H. to testify via closed circuit television.

32

¶ 56                          C. Other-Crimes Evidence

¶ 57    We now turn to the defendant's claim that the trial court erred when it allowed other-crimes

evidence of the alleged sexual assault of A.T. pursuant to section 115-7.3 of the Code (725 ILCS

5/115-7.3 (West 2022)). We note that the defendant asserts an additional and separate argument

that evidence of the "penis shaped rock" and testimony regarding the defendant threatening to

"pinch the penis of A.T." were both irrelevant and inadmissible. However, considering that all the

above evidence was admitted while the other-crimes evidence was being presented to the jury and

the standard of review is identical, we address them together.

¶ 58    Evidence of other crimes is generally inadmissible to show a defendant's propensity to

commit the charged criminal conduct. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Such

evidence, while relevant, is excluded because it "has 'too much' probative value." *Id.* (quoting

*People v. Manning*, 182 Ill. 2d 193, 213 (1998)). Instead, "[e]vidence of other offenses may be

admissible to demonstrate 'motive, intent, identity, absence of mistake, *modus operandi*, or any

other relevant fact other than propensity.' " *People v. Smith*, 2015 IL App (4th) 130205, ¶ 21

(quoting *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 37). " 'Indeed, other-crimes evidence is

admissible to prove any material fact other than propensity that is relevant to the case.' " *People

v. Johnson*, 368 Ill. App. 3d 1146, 1154 (2006) (quoting *People v. Spyres*, 359 Ill. App. 3d 1108,

1112 (2005)).

¶ 59    However, other-crimes evidence demonstrating propensity may be admissible under

section 115-7.3 when a defendant is charged with one of the enumerated sex offenses in the statute.

*People v. Ward*, 2011 IL 108690, ¶ 25; 725 ILCS 5/115-7.3(a) (West 2022) (listing the offenses

of criminal sexual assault and aggravated criminal sexual abuse). "The other offenses must have a

threshold similarity to the charged conduct to be admissible." *Smith*, 2015 IL App (4th) 130205, ¶ 23.

¶ 60    " 'Where other-crimes evidence meets the initial statutory requirements, the evidence is admissible if it is relevant and its probative value is not substantially outweighed by its prejudicial effect.' " *Id.* ¶ 21 (quoting *Vannote*, 2012 IL App (4th) 100798, ¶ 38). When weighing the probative value of the other-crimes evidence against any undue prejudice against the defendant, section 115-7.3(c) permits the trial court to consider (1) the proximity in time to the charged offense, (2) the degree of factual similarity to the charged offense, or (3) other relevant facts and circumstances. 725 ILCS 5/115-7.3(c) (West 2022). The trial court must, however, "engag[e] in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Donoho*, 204 Ill. 2d at 186.

¶ 61    A trial court's decision to admit other-crimes evidence will not be reversed on appeal absent an abuse of discretion. *Id.* at 182. "An abuse of discretion has occurred when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the position adopted by the trial court." *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 75.

¶ 62    "Our supreme court has repeatedly admonished its appellate courts that reasonable minds may differ about whether evidence of other crimes or bad acts is admissible without requiring reversal under an abuse-of-discretion standard of review." *People v. Serritella*, 2022 IL App (1st) 200072, ¶ 87 (citing *Donoho*, 204 Ill. 2d at 186).

¶ 63    In his brief on appeal, the defendant argues that the trial court erred by allowing the State to offer other-crimes evidence related to the sexual assault committed upon A.T., because (1) L.H. (7) and A.T. (14) were different ages, (2) the proximity in time between the offenses, and (3) the prejudicial effect of the other-crimes evidence outweighed its probative value in that it became the

34

focal point of the trial. Further, he argues that the amount of other-crimes evidence and testimony at trial had the effect of a "trial within a trial," and the cumulative effect of the alleged sexual assault on A.T., the evidence of the rock shaped like a penis, and the threat to pinch the penis of A.T. resulted in undue prejudice by directing focus away from the charged offenses involving L.H. In addition, he specifically argues error where the trial court admitted evidence of a "penis shaped rock" located in the defendant's residence and testimony by A.T. that the defendant chased him around the house and "pinched his penis." He argues the evidence was not relevant to the allegations of the sexual assault on L.H., because (1) the rock was never displayed to L.H., unlike the other children, (2) L.H. was not present when the defendant threatened to pinch the penis of A.T., and (3) the evidence was only used for the inference that the defendant was a "sexually depraved person."

¶ 64    In response, the State argues that the other-crimes evidence was admissible under section 115-7.3 of the Code, which allows the admission of other-crimes evidence for propensity purposes, and the evidence did not create a trial within a trial. The State asserts that there were few meaningful differences between the alleged acts and any differences were related to peripheral matters while the actual sexual contact was nearly identical. Both L.H. and A.T. testified that the sexual assaults occurred while in the defendant's house, that the defendant approached them while they were asleep, that he pulled their pants down and placed his mouth on their penis, and that the defendant flipped them over and put parts of his face on their anus. In addition, the State argues that the defendant makes only conclusory assertions and fails to support or explain his argument that the other-crimes evidence became the focal point of the trial and caused undue prejudice. Further, the State emphasized that the trial court addressed this issue in its written order granting the State's motion where it found that "there are vast significant similarities between the offenses

35

that enhance the degree of probative value well past any substantial undue prejudice against the defendant." At no point does the defendant attempt to explain how the trial court's finding that the probative value of this evidence was enhanced by its high degree of factual similarity was improper. In addition, the State argues that the additional other-crimes evidence, including the "penis shaped rock" and testimony that the defendant pinched A.T.'s penis, was relevant because the evidence had the tendency to establish the defendant's involvement in the sexual assault against A.T., and thus the propensity to commit acts of sexual assault. Lastly, the State argues that even if it were erroneously entered into evidence, any error was harmless in the light of the "compelling evidence" from L.H., the forensic interview, and the sexual assault on A.T.

¶ 65    First, the trial court's balancing determination between the prejudicial effect and probative value of the other-crimes evidence was not an abuse of discretion. We reject the defendant's argument that the proximity in time between the offenses, which occurred only a few months apart, and the age difference between L.H. and A.T. is an important distinction and find it meritless in light of the other overwhelming factual similarities between the offenses. Further, we find that the evidence of the defendant's sexual assault on A.T. is highly probative because the jury could use this evidence for propensity purposes. Although the evidence was certainly harmful to the defendant's case, we do not view it as unfairly prejudicial considering the high degree of factual similarity. Considering the similarity between the sexual assault of L.H. and A.T. and the strength of the DNA evidence related to A.T., we conclude that the trial court's balancing determination was not an abuse of discretion.

¶ 66    Next, we reject the defendant's argument that the other-crimes evidence became the focal point of the trial or that an improper "trial within a trial" occurred. In *People v. Walston*, 386 Ill. App. 3d 598, 618 (2008), the Second District evaluated the amount of evidence to be admitted

36

under section 115-7.3. The court noted that, under section 115-7.3, the State "has a compelling reason to introduce thorough evidence to establish a defendant's propensity." *Id.* at 613. The court also gave an "expansive interpretation" regarding the amount of evidence that can be allowed under section 115-7.3. *Id.* at 625. Regarding the danger of "mini-trials," the court reasoned that the "danger of unfair prejudice [from a mini-trial] in the context of a section 115-7.3 case, as opposed to a common-law other-crimes case, is greatly diminished." *Id.* at 619. Finally, the court reasoned that any "limits under section 115-7.3 on mini-trials based on judicial economy must *** defer largely to prosecutorial discretion." *Id.* at 621.

¶ 67    Here, we find that the trial court did not abuse its discretion and the other-crimes evidence was not so overabundant as to cause jury confusion or unnecessary delay. This is not a case where multiple other crimes victims testified about prior sexual assaults involving the defendant. In this case, the other-crimes evidence presented at trial related only to one single incident involving the defendant. In addition, the trial court specifically addressed this argument and noted that A.T.'s testimony lasted between 20 and 25 minutes and that the testimony from other witnesses was 10 minutes or less in length. Even including the DNA evidence, the trial court found that all of the evidence combined did not prolong the trial and that "the court's limiting instruction, clearly maintained the focus of the purpose of the other crimes evidence with regards to propensity, and it did not cloud any issues with regards to L.H.'s case-in-chief." To the extent that the defendant argues that corroborating other-crimes evidence, including the "penis shaped rock" and A.T.'s testimony about the defendant pinching his penis, is not allowed under section 115-7.3 or irrelevant to the offenses involving L.H., we disagree. As held in *People v. Bates*, 2018 IL App (4th) 160255, ¶ 89, where not only the testimony of the alleged other crime victim was presented, but also evidence corroborating that victim's testimony, such evidence may be necessary to establish the

defendant's involvement in the other crime and, thus, the defendant's propensity for committing sex offenses. Accordingly, we find that the trial court did not abuse its discretion in allowing the propensity evidence, as it was used to establish the defendant's involvement in the assault on A.T. and, thus, propensity for committing sex offenses, and it was not so great that it caused unfair prejudice to the defendant, jury confusion, or delay.

¶ 68    Ultimately, we again stress the importance of the standard of review. At exactly what point the quantity of evidence becomes unduly prejudicial is left to the trial court's discretion and reviewing courts have noted that "it is difficult to determine precisely where to draw the line." *People v. Cardamone*, 381 Ill. App. 3d 462, 497 (2008).

¶ 69    "Thus, while undue prejudice *can* arise in a section 115-7.3 case, 'the actual limits on the trial court's decisions on the quantity of propensity evidence to be admitted under section 115-7.3 are relatively modest, especially when combined with the highly deferential abuse-of-discretion standard that governs review of such trial court decisions.' " (Emphasis in original.) *People v. Perez*, 2012 IL App (2d) 100865, ¶ 49 (quoting *Walston*, 386 Ill. App. 3d at 621). Therefore, we cannot conclude that the trial court abused its discretion by allowing the propensity evidence.

¶ 70                                                  D. Sentencing

¶ 71    Lastly, we turn to the defendant's argument that trial court abused its discretion when it sentenced the defendant, because of the "disparity of the sentences between the counts" and "the totality of the sentences."

¶ 72    The law regarding sentencing is well established. The trial court has broad discretionary powers to determine a defendant's sentence. See *People v. Stacey*, 193 Ill. 2d 203, 209 (2000); *People v. Fern*, 189 Ill. 2d 48, 53 (1999). Its decision merits great deference because the trial judge is in the best position to make a reasoned judgment, weighing factors such as his direct

38

observations of the defendant and his character. See *Fern*, 189 Ill. 2d at 53; see also *People v. Kelley*, 2013 IL App (4th) 110874, ¶ 46 (quoting *People v. Price*, 2011 IL App (4th) 100311, ¶ 36) (trial court's sentence must be based on particular circumstances of each case, including the defendant's credibility, age, demeanor, moral character, mentality, social environment and habits). A reviewing court must not substitute its judgment with respect to sentencing for that of the trial court merely because it would have weighed factors differently or because it desires to invoke clemency. See *Fern*, 189 Ill. 2d at 53 (reviewing court "must proceed with great caution" in deciding whether to modify sentence); *People v. Hayes*, 159 Ill. App. 3d 1048, 1052 (1987); accord *People v. Coleman*, 166 Ill. 2d 247, 258 (1995) (trial court's decision with respect to sentencing "is entitled to great deference"). Therefore, a sentence imposed by the trial court will not be altered absent an abuse of discretion. See *Stacey*, 193 Ill. 2d at 209-10; accord *Kelley*, 2013 IL App (4th) 110874, ¶ 46 (quoting *Price*, 2011 IL App (4th) 100311, ¶ 36).

¶ 73    "In reviewing a claim that a sentence within statutory limits is excessive, the court must consider whether, given the particular facts of the case, the sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Fern*, 189 Ill. 2d at 55-56.

¶ 74    The defendant argues that the trial court abused its discretion by imposing consecutive sentences of 16 years on counts I and V but only 6 years on counts II and VI. He argues that his convictions on the four counts of predatory criminal sexual assault of a child are all the same, and therefore there should be no disparity between the sentences for the same charge. Further, he asserts "[i]f a sentence of six years on each was proper for two of the counts, then the same sentence should have been imposed on the other two counts." He also argues that the cumulative sentence of 44 years "equates to a death sentence" given the defendant's age of 56 at the time of trial. In

39

addition, the defendant argues that the trial court's decision to impose 16 years on counts I and V and only 6 years on counts II and VI was the result of the trial court's consideration of an improper factor in that no provision in the Code allows a sentencing court "to lump together the sentences on a particular date and then assess the total amount of sentence for offenses of that date among the offenses charged and convicted for that date." Thus, the sentence should not be affirmed.

¶ 75    In response, the State argues that the trial court is in the best position to fashion an appropriate sentence that balances between the goals of protecting society and rehabilitating the defendant. In addition, the trial court enjoys broad discretion in fashioning an appropriate sentence within statutory limits. Further, where the sentence imposed falls within statutory range, the sentence is presumed valid and not excessive. The State argues that the defendant's sentence for each count falls within the statutory range and is presumed valid and not excessive. In addition, the State argues that there is no evidence that the trial court failed to consider any relevant mitigating factors and, as such, it is presumed that the trial court considered all relevant factors. The State also argues that the trial court did not consider an improper factor by "lumping together" charges when fashioning the defendant's sentence and that the defendant misapprehends the trial court's statements. The State asserts that the trial court's statement regarding the dates was to distinguish between the identical charges for each separate date, "one oral and one anal on two separate dates." The State argues that the trial court was simply making clear for the record that it determined the counts involving contact with the victim's penis to be more egregious than the counts involving contact with the victim's anus due to the associated evidence of grooming and premeditation, which it took into great consideration when imposing a 16-year sentence on each count.

¶ 76   In his reply, the defendant argues that sentencing must be conducted on each count separately. That consecutive sentences do not constitute a single sentence and cannot be combined as though they were one sentence for one offense and each conviction must be treated individually. He argues that the trial court stated at the hearing on the motion to reconsider sentence that it found it appropriate to sentence the defendant to 22 years for the two acts on each separate date. Thus, he asserts that it is apparent from this statement that the trial court "lumped" the two offenses together, which is impermissible.

¶ 77   Here, the trial court noted on the record that it had considered the presentence investigation report, the evidence at the hearing and that was presented at trial, the seriousness of the offense, the defendant's statement of allocution, the arguments of the parties, all of the statutory facts in aggravation and mitigation whether specifically mentioned or not, and the history and character of the defendant. The court specifically found that it considered as mitigating factors the defendant's advanced age, that the defendant's conduct did not cause or threaten serious harm, and that none of the defendant's previous criminal history had occurred within a 10-year period, but his history did include six separate felony convictions. In addition, at the hearing on the defendant's motion to reconsider sentencing the trial court, again, explained that it considered all of the above aggravating and mitigating factors and determined that the 44-year sentence imposed was necessary and appropriate based on the seriousness of the offenses charged. Accordingly, we find that under the particular facts of this case, the sentence was not excessive or manifestly disproportionate to the nature of the offense.

¶ 78   Next, we address the defendant's contention that the trial court considered improper factors or "lumped" together counts to determine a sentence. Based on our review of the record, nothing in the trial court's discussion regarding the cumulative sentence of 22 years for the counts on each

separate date, resulting in a total sentence of 44 years, suggests that the trial court's decision was, itself, based on that fact. The mere fact that the trial court noted that those offenses occurred on the same date does not in any way suggest that the trial court's sentencing decision was based on combining, or "lumping" together, certain counts. We find the following statement by the trial court instructive:

> "This Court looked at the two separate dates with regards to other factors as I've previously indicated on the record at the original sentencing hearing. What I called the nature of premeditation in essence or grooming and other factors. Look at those in a total, when I did the—*each* sentence, for the first alleged offense on *each* date—the 16-year sentence—I took those into great consideration." (Emphases added.)

The above statement clearly indicates that the trial court was considering each count separately when fashioning the defendant's sentence and that any reference by the trial court to the 22-year sentence for each date was for the purpose to simplify for the record and the parties the total sentence of 44 years. We agree with the State that the need for clarity on the record, considering the defendant had been charged with identical offenses on separate dates, necessitated the trial court to distinguish between them due to its determination that certain counts were more egregious than others. Accordingly, we find that the defendant has failed to overcome the presumption that the sentence imposed, which falls within the statutory limits, was not excessive and that the trial court considered the appropriate factors.

¶ 79                                        III. CONCLUSION

¶ 80    For the foregoing reasons, we affirm the defendant's convictions and sentence.


¶ 81    Affirmed.